**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**TIMOTHY AARON MCPEAK,**

     **Plaintiff,**

**vs.**                                                           **CIVIL ACTION NO. 1:17-CV-04382**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered January 23, 2019 (ECF No. 18), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court is Plaintiff's Brief in Support of Complaint and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 15, 16)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (ECF No. 15), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 16); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from the Court's docket as explained *infra*.

**Procedural History**

The Plaintiff, Timothy Aaron McPeak (hereinafter referred to as "Claimant"), protectively filed his applications for Titles II and XVI benefits on April 2, 2014, alleging disability since August 20, 2013, because of "left leg injuries from gunshot wound."[1] (Tr. at 274) His claims were initially denied on July 29, 2014 (Tr. at 135-139, 140-144) and again upon reconsideration on December 1, 2014. (Tr. at 149-155, 156-162) Thereafter, Claimant filed a written request for hearing on December 11, 2014. (Tr. at 163-164) An administrative hearing was held on October 20, 2016 before the Honorable Toby J. Buel, Sr., Administrative Law Judge ("ALJ"). (Tr. at 40-81) On December 8, 2016, the ALJ entered a "partially favorable" decision, having found that Claimant was disabled from August 20, 2013 through September 23, 2014, however, beginning September 24, 2014 the ALJ found Claimant was no longer disabled. (Tr. at 18-39) Claimant filed a timely request for review (Tr. at 11-12); however, on October 13, 2017, the Appeals Council denied the request, rendering the ALJ's decision the final decision of the Defendant, (hereinafter referred to as "Commissioner"). (Tr. at 2-7)

On November 17, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10) Subsequently, Claimant filed a Brief in Support of Complaint (ECF No. 15), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 16), and Claimant filed his Reply to Brief in Support of Defendant's Decision. (ECF No. 17) Consequently, this matter is fully briefed and ready for resolution.

---

[1] Claimant also indicated that he last worked on August 1, 2012 because his "hours were cut back to zero." (Tr. at 274)

**Claimant's Background**

Claimant was 36 years old as of the alleged onset date, and considered a "younger person", throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 53) Claimant has a high school education. (Tr. at 55) Claimant previously worked as a coal mine laborer, equipment operator, truck driver, recycler and tire changer. (Tr. at 32, 60-62)

**Standard**

In a typical case, 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i) provide that a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). However, in cases concerning whether a claimant has achieved "medical improvement" and are no longer disabled, as in the case *sub judice*, the Commissioner bears the burden of establishing medical improvement. See, 42 U.S.C. § 423(f)(1); Lively v. Bowen, 858 F.2d 177, 181 n.2 (4th Cir. 1988); Pack v. Heckler, 740 F.2d 292, 294 (4th Cir. 1984); see also, Chrupcala v. Heckler, 829 F.2d 1269, 1274 (3d Cir. 1987)["Fairness would certainly seem to require an adequate showing of medical improvement whenever an ALJ determines that disability should be limited to a specified period."].

It is noted that the "medical improvement" standard as set forth in the Regulations, *infra*, expressly applies in continuing review of benefits cases, and that the Fourth Circuit has not specifically addressed whether this standard applies in appeals concerning an award for a closed period of benefits followed by a determination that the closed period ended. Nevertheless, other

courts have held that the "medical improvement" standard applies to closed period cases as well. See McKenzie v. Colvin, 2016 WL 182924, at *4 (D.S.C. Jan. 4, 2016) *report and recommendation adopted by*, McKenzie v. Colvin, 2016 WL 183907 (D.S.C. Jan. 14, 2016) (citing Waters v. Barnhart, 276 F.3d 716, 719–720 (5th Cir. 2002); Shepherd v. Apfel, 184 F.3d 1196, 1198 (10th Cir. 1999); Burress v. Apfel, 141 F.3d 875 (8th Cir. 1998); Jones v. Shalala, 10 F.3d 522, 523-524 (7th Cir. 1993); Pickett v. Bowen, 833 F.2d 288, 293 (11th Cir. 1987); McDaniel v. Astrue, No. 1:07-CV-779, 2009 WL 929555, at*3 n. 3 (M.D.N.C. Apr. 3, 2009)); Small v. Astrue, 2009 WL 3029737 (E.D.N.C. Sept. 22, 2009); Sagastume v. Colvin, 2015 WL 5735488 (D.Md. Sept. 29, 2015); Czerska v. Colvin, 2013 WL 5335406 (D.Md. Sept. 20, 2013); Fennell v. Berryhill, 2017 WL 4230557 (E.D.N.C. Aug. 31, 2017), *report and recommendation adopted by*, Fennell v. Berryhill, 2017 WL 4226039 (Sept. 22, 2017).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). However, once a claimant has been found disabled at any point in the sequential evaluation process, the Commissioner must determine if the disability continues through the date of the decision and further, whether there has been sufficient medical improvement in a claimant's impairments such that the claimant is able to engage in substantial gainful activity. See 20 C.F.R. §§ 405.1594(a), 416.994(a). To determine whether a claimant continues to be disabled, the Commissioner follows an eight-step process for Title II claims and a seven-step process for Title XVI claims. The evaluation processes are essentially the same with the exception of the first step regarding substantial gainful activity, which

applies only to Title II claims. Id. §§ 404.1520(b), 416.920(b), 404.1594(f)(1). The steps are as follows:

At step two for Title II claims and step one for Title XVI claims, the ALJ must determine whether the claimant has an impairment, or combination of impairments, which meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; if so, the claimant's disability continues. If not, the evaluation proceeds to the next steps. 20 C.F.R. §§ 405.1520(d), 416.920(d), 404.1594(f)(2), 416.994(b)(5)(i).

At steps three and two for Titles II and XVI claims, respectively, the ALJ must determine whether there been medical improvement as shown by a decrease in the medical severity of the impairment(s) as established by improvement in symptoms, signs or laboratory findings. If so, the analysis proceeds to step four for the Title II claim and to step three for the Title XVI claim. If not, the adjudicator proceeds to steps five and four, respectively. 20 C.F.R. §§ 404.1594(f)(3), 416.994(b)(5)(ii).

 At steps four and three for Titles II and XVI claims, respectively, the ALJ must determine if there was any medical improvement related to the ability to work (i.e., does it result in an increase in the claimant's capacity to perform basic work activities; has there been an increase in the claimant's residual functional capacity ("RFC")). If yes, the analysis continues to steps six and five for Titles II and XVI claims, respectively. If not, the analysis proceeds to steps five and four, respectively. Id. §§ 404.1594(f)(4), 416.994(b)(5)(iii).

At steps five and four for Titles II and XVI claims, respectively, the ALJ must determine if there an exception to medical improvement. If there is not, the claimant's disability continues. If an exception from the first group of exceptions to medical improvement applies (i.e., substantial

evidence shows that the claimant has benefited from "advances in medical or vocational therapy or technology" or "undergone vocational therapy" if either is "related to [the] ability to work"), see 20 C.F.R. §§ 405.1594(d), 416.994(b)(3), then the adjudicator proceeds to steps six and five for Titles II and XVI claims, respectively. If an exception from the second group applies (i.e., disability determination was fraudulently obtained, claimant was uncooperative, unable to be found, or failed to follow prescribed treatment, see 20 C.F.R. §§ 405.1594(e), 416.994(b)(4), the claimant's disability ends. Id. §§ 405.1594(f)(5), 416.994(b)(5)(iv).

At steps six and five for Titles II and XVI claims, respectively, the ALJ must determine if the claimant's current combination of impairments is severe. If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the claimant's disability ends. If they do, then the analysis proceeds to the seventh and sixth steps for Titles II and XVI claims, respectively. Id. §§ 405.1594(f)(6), 416.994(b)(5)(v).

At steps seven and six for Titles II and XVI claims, respectively, the ALJ must determine if the claimant possesses the RFC to perform past relevant work. If so, the claimant's disability ends. If not, the analysis proceeds to the final steps in the sequential evaluation processes. Id. §§ 405.1594(f)(7), 416.994(b)(5)(vi).

At the final steps in deciding Title II and XVI claims, the ALJ must determine if the claimant's RFC, when considered with the claimant's age, education, and work experience, allow the claimant to do other work. If it does, the claimant's disability ends. If not, then the claimant's disability continues. Id. §§ 405.1594(f)(8), 416.994(b)(5)(vii).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured

worker status through December 31, 2013. (Tr. at 26, Finding No. 1) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date of August 20, 2013. (Id., Finding No. 2) Next, from August 20, 2013 through September 23, 2014, the ALJ found that Claimant had the following severe impairments: fractures of the left tibia and fibula status post open reduction internal fixation (ORIF) and treatment of left lower extremity; anxiety disorder; and carpal tunnel syndrome. (Id., Finding No. 3) The ALJ then concluded that from August 20, 2013 through September 23, 2014, Claimant's left leg impairments met the criteria of Listing § 1.02A. (Id., Finding No. 4) The ALJ determined that Claimant was disabled from August 20, 2013 through September 23, 2014. (Tr. at 27, Finding No. 5)

Since the closed period of disability, beginning September 24, 2014, the ALJ determined that Claimant had not developed any new impairment or impairments, and that his impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 28, Finding Nos. 6, 7) As of September 24, 2014, the ALJ found that medical improvement had occurred and was related to Claimant's ability to work. (Tr. at 29, Finding Nos. 8, 9) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work

> Except he can sit for 6 hours in an 8-hour day, stand for 4 hours in an 8-hour day, and walk for 2 hours in an 8-hour day. He should not be exposed to ladders, ropes, or scaffolding and should not deal with balancing. He could stoop, kneel, crouch, and crawl on an occasional basis. He should have no use of foot controls with the left lower extremity, but right would be unlimited. He should have no exposure to heights, moving machinery, or hazards. He could occasionally be exposed to hot and cold temperature extremes; fumes, odors, and dusts; noise at the office level; wetness; humidity; and vibration. He should have no direct public contact as part of his normal duties and responsibilities. Incidental public contact would be permitted. He can occasionally deal with supervisors and co-workers. He should

> have no complex work, fast-paced work, teamwork, or quota or piecework. He would be afflicted with chronic pain noticeable to himself at all times, but could maintain attention and concentration in normal 2 hour increments with a morning break, lunch break, and afternoon break. He would also have to use a cane for ambulation.

(Tr. at 29-30, Finding No. 10) Next, the ALJ found Claimant was unable to perform any past relevant work beginning September 24, 2014. (Tr. at 32, Finding No. 11) Finally, the ALJ found that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there were jobs that exist in significant numbers in the national economy that Claimant could perform beginning September 24, 2014. (Tr. at 33, Finding Nos. 12-15) Ultimately, the ALJ determined Claimant's disability ended September 24, 2014. (Id., Finding No. 16)

**Claimant's Challenges to the Commissioner's Decision**

In support of his appeal, Claimant alleges two main errors occurred in the ALJ's analysis:

The first is that the ALJ's RFC assessment is flawed because Claimant's carpal tunnel syndrome, which primarily affected his left hand, coupled with his need to use a cane was not properly explained in light of the fact that Claimant is right-hand dominant, and whether he was capable of performing light work with his impaired left hand while requiring his right hand to use his cane. (ECF No. 15 at 5-6) Claimant notes that the Regulations concerning lifting/carrying restrictions do not specify one or bilateral hand usage, therefore, further explanation was warranted. (Id.) Claimant contends that the employment descriptions envision bilateral capability for lifting/carrying, however, the ALJ did not incorporate Claimant's impairments in the hypothetical questions to the vocational expert. (Id. at 6) Had the vocational expert been asked about Claimant's left-hand impairment with lifting and carrying while using his right hand for his

cane, her opinion would have resulted in a finding of disability. (Id.) Further, the vocational expert identified jobs that would require constant, repetitive movement of Claimant's hands, however, because the ALJ failed to include limitations as they related to his carpal tunnel syndrome, the fifth step finding is in error. (Id. at 6-7)

As for the second ground, Claimant points out that despite the great weight afforded to the opinion of Dr. Owens, who did not opine that Claimant was disabled during the closed period or that Claimant met or equaled a Listing, the ALJ found Claimant disabled from August 20, 2013 through September 23, 2014. (Id. at 7-8) Claimant argues that the ALJ's finding medical improvement as of September 24, 2014 is not based on any medical opinion of record, but is instead based on his own lay opinion. (Id.)

Claimant asserts that the final decision is not supported by substantial evidence. (Id. at 8-9)

In response, the Commissioner argues that the ALJ's RFC assessment, as well as the hypothetical, fully accounted for Claimant's carpal tunnel syndrome and use of a cane for ambulation. (ECF No. 16 at 9) The vocational expert identified three sedentary positions that Claimant could still perform, and the unskilled sedentary occupational basis will not be significantly eroded due to his use of a hand-held assistive device. (Id. at 11-12) The Commissioner contends that Claimant does not provide any objective evidence that restricts the use of one hand versus the other, and the ALJ was entitled to rely on Dr. Owens' opinion, who did not opine that Claimant had any manipulative restrictions or upper extremity restrictions. (Id. at 12) The Commissioner also argues that the record does not support Claimant's characterization of his carpal tunnel as "severe", but that it was in fact "mild", and further contends that none of the

sedentary jobs identified by the vocational expert called for "constant, repetitive use of one's hands", but only require low levels of manual and/or finger dexterity. (Id. at 13)

With regard to the disability determination during the closed period, the Commissioner points out that this is an administrative finding only made by the Commissioner and any opinion to that extent is not entitled to any special significance. (Id. at 14) The ALJ determined that Claimant was disabled, having met the criteria under Listing 1.02A during the closed period based on the medical evidence of record as well as the testimonies provided by Claimant and Dr. Owens. (Id. at 15)

The ALJ also relied on the medical evidence, including the testimony provided by Dr. Owens, that as of September 24, 2014 Claimant was no longer disabled. (Id.) Dr. Owens specifically testified that based on the September 23, 2014 medical record, which noted Claimant's fractures had fully healed and that he was able to ambulate with a cane, Claimant's left leg impairment did not meet or equal a Listing, and further, that based on Claimant's medical status at the time, he was capable of light work. (Id. at 16-17) The ALJ's determination that Claimant had reached medical improvement on September 24, 2014 was based upon the medical evidence of record, including medical opinion, and is not based solely on his own opinion. (Id. at 17)

The Commissioner asserts that the final decision is based on substantial evidence and asks the Court to affirm.

In reply, Claimant states that the medical record dated September 23, 2014 noted that his fractures had been resolved, however, there is no medical opinion in the record that Claimant's impairment had been restored to the point of employability as of that date.[2] (ECF No. 17 at 1)

---

[2] Citing Czerska v. Colvin, 2013 WL 5335406 (D.Md. Sept. 20, 2013).

Claimant argues that the ALJ assumed he could return to work on September 23, 2014, and he failed to explain how he arrived at that assumption; this lack of explanation precludes meaningful review. (Id. at 2)

Further, Claimant states that Dr. Owens did not testify about Claimant's hand restrictions, and emphasizes that the lack of explanation for the ALJ's RFC with respect to the limitations presented by his carpal tunnel syndrome and his cane use does not amount to substantial evidence; Claimant argues that constant, repetitive use of one's hands is synonymous with bilateral manual dexterity, and the failure to specify what evidence was relied upon in making those findings precludes meaningful review. (Id. at 2-3)

Claimant contends that the ALJ was indeed "playing doctor" in contravention of Lewis v. Berryhill, 858 F.3d 858, 869 (4th Cir. 2017) because he alone offered opinions concerning Claimant's medical improvement, ability to bear weight, and the existence of a closed period of disability. (Id. at 4)

**The Relevant Evidence of Record**[3]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Medical Records:

On August 12, 2013, Claimant was taken to the Bluefield Regional Medical Center emergency department with an accidental self-inflicted gunshot wound to his left hand, avulsing the tissue at the third and fourth webspace, and lower left leg, fracturing the tibia and fibula with the bullet entering medially and exiting laterally. (Tr. at 354) He reported that he had bought a gun

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

the day before and did not know it was loaded when he fired it. (Id.) The following day, on August 13, 2014, Claimant underwent surgery to repair his fractured left tibia and fibula as well as his left hand wound. (Tr. at 359) He did well postoperatively and was discharged the following day, August 14, 2013; the discharge diagnoses included: status post left hand debridement and partial wound closure with removal of foreign body, gunshot fragment; status post irrigation and debridement with removal of foreign body, gunshot fragment of left leg; and status post left tibia rodding with antibiotic cement fixation. (Tr. at 361) He started ambulating, weightbearing as tolerated. (Id.)

On August 27, 2013, Claimant presented for post-op with the surgeon, Walid Azzo, M.D., Ph.D. (Tr. at 374) Dr. Azzo removed the sutures, noting the wounds had healed and that Claimant had no lower left extremity swelling or edema, calf pain, or ankle instability. (Id.) Dr. Azzo also noted Claimant had no pain on flexion or extension of his left knee. (Id.) Claimant continued to follow up with Dr. Azzo, and by December 10, 2013, it was noted that while Claimant appeared in no acute distress, and that the alignment was "good", the fracture remained displaced and exhibited "delayed healing." (Tr. at 382) Dr. Azzo referred Claimant to James Day, M.D. for further possible treatment for non-union of the left tibia. (Tr. at 384)

On February 18, 2014, Claimant presented to Dr. Day, and observed to be in good spirits, well appearing, in no acute distress, and walked with a cane in his left hand. (Tr. at 442) On examination, Claimant was able to flex and extend his left knee, dorsiflex and plantar flex of his left foot and ankle, and was "somewhat tender" along the midshaft of the anterior left tibia. (Tr. at 443) X-rays showed the surgical hardware was in place. (Tr. at 444) Dr. Day noted Claimant smoked a pack of cigarettes every day. (Tr. at 442) Dr. Day diagnosed left tibia non-union, possibly

12

due to smoking. (Id.) He recommended a bone stimulator, instructed Claimant to use a crutch instead of a cane for more support, continue protective weight-bearing ambulation, and counseled him about the need to stop smoking. (Id.)

On April 15, 2014, Dr. Day noted Claimant had been using protected weight-bearing ambulation using crutches. (Tr. at 428) X-rays showed some callus along the tibial canal, but Claimant admitted that he had had not stopped smoking. (Tr. at 428, 430) He was again instructed to stop smoking immediately, continue using the bone stimulator, and continue protected weight-bearing ambulation. (Tr. at 428) Dr. Day applied a PTB with cast shoe, and prescribed Tramadol, as Claimant had not been on narcotics for the last couple of months. (Id.)

On May 6, 2014, Claimant returned to Dr. Day and it was noted that Claimant was in good spirits and no acute distress. (Tr. at 425) X-rays showed "vast improvement" since the last x-rays taken six weeks earlier, with a large area of callus formation along the midshaft of the left tibia (Tr. at 425, 427) Claimant reported that he had been using the bone stimulator a couple of times a day, had been taking his vitamin D supplement, and had quit using nicotine. (Tr. at 425) Dr. Day opined that the non-union issue was "probably resolving," but instructed Claimant to continue using the bone stimulator, maintain no nicotine use, maintain vitamin D supplements, use crutches for ambulation, and avoid weight-bearing. (Id.) Dr. Day also noted no narcotic pain relief was to be dispensed. (Id.)

On September 23, 2014, Dr. Day noted Claimant's leg fractures were fully healed. (Tr. 422, 424). Dr. Day also noted that Claimant was now using a cane to walk and displayed a limp. (Tr. at 422) Claimant had no complaints of pain over the previous fracture site, and did not appear to be in any distress. (Id.) Based on the clinical results that showed the non-union issue had

resolved, Claimant was released to begin "an intense program of strength building and quads, with abductor strengthening and gait training" to increase leg strength and improve gait. (Id.) He was cleared for weight-bearing as tolerated, Dr. Day did not prescribe any assistive aids or medications and did not impose any other physical limitations or restrictions. (Id.)

Claimant visited Ronald Billips, M.D. on September 30, 2014 for complaints of left hand pain and lower left leg pain. (Tr. at 451, 480) It was noted that Claimant specifically reported pain and numbness of the third and fourth fingers of his left hand. (Id.) His left hand showed a scar in the web of the third and fourth fingers and that sensation was intact but dulled and reduced. (Tr. at 452)

On October 30, 2014, Claimant saw Bandhu Paudyal, M.D. on referral from Dr. Billips for his left lower extremity pain, lower back pain, and left hand numbness and pain. (Tr. at 455) Claimant returned to Dr. Paudyal on December 9, 2014. (Tr. at 460) Dr. Paudyal ordered nerve conduction study/EMG tests of the left leg. (Tr. at 461, 463-464) The needle EMG showed normal findings. (Tr. at 461) Dr. Paudyal's impression was "likely traumatic left superficial peroneal sensory and left saphenous neuropathy. Other nerves serving motor function (muscle strength) are intact." (Id.)

On August 13, 2015, Claimant returned to Dr. Billips complaining of increasing left leg pain and requesting another referral to Dr. Paudyal for possible carpal tunnel syndrome. (Tr. at 484)

On December 9, 2015, Claimant returned to Dr. Paudyal complaining of continued lower left leg pain, and bilateral hand numbness, more with the left hand; he reported that he relieved his hand numbness by "shaking off of his hand." (Tr. at 560) On examination, Claimant's right upper

extremity was normal, he demonstrated full 5/5 strength throughout his upper and lower extremities, with limited range of motion of the left ankle. (Tr. at 561) He had reduced sensation on his left leg below the knee and reduced pin sensation in his right thumb and left third and fourth digit. (Id.) His reflexes were normal with down toes, and he was able to walk unaided. (Id.)

Dr. Paudyal noted the nerve conduction study (Tr. at 562-564) indicated a normal left ulnar motor and sensory responses and reduced left ulnar sensory response, but a normal EMG of the right arm. (Tr. at 561) Dr. Paudyal diagnosed mild left carpal tunnel syndrome and prescribed Claimant a wrist brace to wear on the left wrist at night for six weeks. (Id.) A subsequent EMG study on January 20, 2016 indicated mild right carpal tunnel syndrome. (Tr. at 566-570)

On June 20, 2016, Claimant returned to Dr. Paudyal for follow-up. (Tr. at 571) It was noted that the left wrist brace provided "partial improvement of his symptoms." (Tr. at 572) Dr. Paudyal noted a diagnosis of mild bilateral carpal tunnel syndrome but did not prescribe further treatment. (Tr. at 573) A physical examination was unchanged from December 9, 2015, and Claimant was still able to walk unaided. (Id.)

**The Administrative Hearing**[4]

Dr. Owens, a family physician, testified on Claimant's medical status:[5]

David Owens, M.D., Medical Expert Testimony:

The Claimant had an accidental gunshot wound in the left leg in August 2013. He had fractures of the tibia and fibula on the left side. He had an open reduction internal fixation. Unfortunately, he had non-union and non-healing of the fractures following the surgery as shown by an x-ray in February of 2014. This was six months later. As well as chronic pain and numbness and tingling in the lower extremity. He was using crutches in May of 2014. However, he was treated with a

---

[4] The undersigned focuses on the salient portions of the administrative hearing that are pertinent to the issues raised in this appeal.

[5] Due to the dispute between the parties concerning Dr. Owens' testimony, many portions thereof are reproduced *verbatim* per the Transcript.

bon[e] stimulator, and he stopped cigarette smoking, and by September 2014, the x-rays showed complete healing of the fractures of the left leg. However, pain and – his pain and stiffness and sensory deficit continued. An EMG of the left lower leg showed traumatic superficial peroneal and saphenous neuropathy of the left lower extremity.

On physical examination, he had limited range of motion of the left ankle and left knee. He had some loss of sensation in the left leg below the knee. He walked with a mild limp, and used a cane. He also has some left hand numbness, which is consistent with the carpal tunnel syndrome on the left. But those are the major disabling conditions I see in the Claimant[.]

(Tr. at 45-46) Dr. Owens opined that Claimant would not meet or equal a listing. (Tr. at 46) Dr. Owens further opined that Claimant was able to lift 50 pounds occasionally, 20 pounds more frequently. (Id.) However, Claimant could only carry "maybe 20 pounds occasionally, and 10 pounds more frequently." (Id.) In addition to other postural limitations, Dr. Owens testified that "hand controls would be unlimited", and foot controls would be unlimited on the right side, however, on the left side, Dr. Owens did not think that Claimant could do foot controls with the left leg or left foot. (Tr. at 47)

In response to questions from Claimant's attorney, Dr. Owens testified that there was no confirmation of healing or union of the fracture until the note dated September 23, 2014 and that prior to that date, Claimant used a walker and two crutches. (Id.)

Claimant Testimony:

Claimant testified that he was right-handed and demonstrated that he could make a fist for the ALJ. (Tr. at 54) He was wearing a wrist brace on his left wrist for his carpal tunnel syndrome that he advised had been prescribed to him a year earlier. (Id.) He testified that he could not work a 40-hour a week job because his leg hurts constantly, and he has no strength in his hands. (Tr. at 56) Claimant estimated that he could lift and carry "about 10 pounds or so" without problems. (Id.) He described the pain in his leg as sharp and burning that ranges from his ankle to his knee; the

pain in his hands come from the center of his hands and his fingers go numb which cause him to drop things. (Tr. at 57) Claimant stated that walking triggers pain in his leg, and for relief, he needs to lay down for a couple of hours, two to three times a day. (Id.)

With regard to his leg injury, Claimant testified that he initially treated with Dr. Azzo, and then with Dr. Day, who released him from his care in September 2014. (Tr. at 62-63) Claimant confirmed that for at least one year, he used a walker and crutches, and by the very end, in September 23, 2014, he used a single cane. (Tr. at 63-64) Claimant testified that he still has pain and numbness in his left leg from the knee down. (Tr. at 64)

Eventually, Claimant continued treatment for his leg with his primary care physician, Dr. Billips, who referred him to a specialist, Dr. Paudyal. (Tr. at 65-66) Dr. Paudyal did nerve testing on his left leg and on both hands; nerve testing confirmed nerve damage to his left leg as well as carpal tunnel syndrome. (Tr. at 66) Because of the pain in his leg, Claimant testified that he would have to lay down for about five and six hours out of an eight-hour day. (Tr. at 67) The rest of the time, Claimant estimated he would sit more often than stand. (Tr. at 68) He confirmed that he had difficulty walking up steps as well. (Tr. at 69)

Claimant testified that his carpal tunnel syndrome causes him difficulty in gripping items, and that he drops his drinks and does not have as much strength in his hands as he used to. (Id.) He explained that his right hand goes numb when he walks on his cane; he uses both hands to use his cane, and they sometimes go numb. (Id.) Claimant stated that though he wears a brace on his left hand, he does not wear a brace on his right hand because he uses a cane. (Tr. at 70) He explained that his doctor suggested that he not use a right hand brace because a metal piece pushes on the nerve. (Id.) He stated that because of his hand problems, he needs his son or wife to open a

jar for him because he cannot grip it. (Id.) Claimant testified that he is right-handed, however, he has difficulty curling items up or lifting his right hand over his head; he explained that if he has a weight in his right hand, it hurts him to put his hand over his head. (Tr. at 71) Claimant testified that surgery was being considered for his hands. (Id.)

Nancy Shapero, Vocational Expert ("VE") Testimony:

The ALJ asked the VE to assume an individual of the same age, education, and work history as Claimant, who was limited to modified light work, could sit for six hours, stand for four hours, walk for two hours in an eight-hour day; should not be exposed to ladders, ropes, scaffolding, and not deal with balancing; could occasionally stoop, kneel, crouch and crawl; should have no use of foot controls with the left lower extremity, and the right foot be unlimited; should have no exposure to heights, moving machinery, hazards; could occasionally be exposed to hot and cold temperature extremes, fumes, odors, dust, noise at the office level, wetness, humidity and vibration; should have no direct public contact as part of his normal duties and responsibilities, but incidental public contact is permitted; could occasionally deal with co-workers and supervisors; should have no complex work nor fast-paced work nor team work nor quota or piece work; would be afflicted with chronic pain noticeable to himself at all times, but could maintain attention and concentration with normal two hour increments with morning and afternoon breaks and lunch; and would need a cane for ambulation. (Tr. at 77-78)

In response, the VE testified that such a hypothetical individual, and the cane use, would be able to perform sedentary jobs, such as addresser (DOT 209.587-010), order clerk (DOT 209.567-014), and inspector (DOT 669.687-014). (Tr. at 78) She stated that there would be no jobs available if the individual was off task 25 percent of the workday in excess to normal breaks and

lunch. (Id.) The VE further testified that if the individual were off task 15 percent of the day, he would still be precluded from all substantial gainful activity. (Tr. at 79)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

In consideration of Claimant's alleged grounds of error, the undersigned addresses them in reverse order for simplicity:

Determining Medical Improvement:

Claimant argues that the ALJ's finding medical improvement as of September 24, 2014

was rendered without support of medical opinion and a product of "playing doctor", therefore, this determination is not based on the substantial evidence. (ECF No. 15 at 7-8)

As noted *supra*, a decrease in the medical severity of an impairment sufficient to constitute medical improvement must be substantiated by changes in signs, symptoms, or laboratory findings. 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i). To determine whether medical improvement has occurred, the severity of the claimant's current medical condition is compared to the severity of the condition "at the time of the most recent medical decision that [claimant was] were disabled." 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i). The date of the most favorable medical decision is called the "point of comparison." 20 C.F.R. §§ 404.1594(b)(7), 416.994(b)(1)(vii). When the ALJ finds that a claimant is disabled for a closed period in the same decision in which he found that a medical improvement occurred, such as in the case *sub judice*, the disability onset date is the "point of comparison." See Small v. Astrue, 2009 WL 3029737, at *10 (E.D.N.C. Sept. 22, 2009) (citing Program Operations Manual System ("POMS") § DI 28010.105(B)(3)(a)).[6] See also, McDaniel v. Astrue, 2009 WL 929555, at *4 (M.D.N.C. Apr. 3, 2009) (citing Booms v. Commissioner of Soc. Sec., 277 F.Supp.2d 739, 745 (E.D.Mich.2003) (finding the Commissioner's use of the disability onset date as the comparison point date in a closed period case to be "consistent with 42 U.S.C. § 423(f) and with the Secretary's regulation, 20 C.F.R. § 404.1594."). Therefore, the ALJ had to determine if Claimant's medical condition as of August 20, 2013 had improved to the degree necessary that he could maintain substantial gainful activity as of September 24, 2014.

There is no dispute that Claimant had no new impairment or combination of impairments

---

[6] The undersigned notes that this website had been updated since this case was decided, however, the substantive language in POMS had not with respect to using the established onset date as the comparison point in closed period cases. The update is available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0428010105#b.

since the closed period of disability. There is no dispute that Claimant was disabled during the closed period, as the ALJ found his lower left extremity impairment met Listing 1.02A:[7] the ALJ noted this impairment was due to an accidental gunshot wound requiring emergency surgery, insertion of a rod in the left leg, and that Claimant had to use a walker or crutches in order to ambulate for at least a year afterwards. (Tr. at 27) Indeed, in support of this finding, the ALJ noted Dr. Owens' testimony concerning the objective medical evidence of the surgery (Tr. at 27, 379, 389) and then "non-union and non-healing of the fractures following surgery as shown by an x-ray in February 2014" causing Claimant chronic pain, tingling, and numbness. (Tr. at 27, 428, 442, 443) Additionally, the ALJ noted Dr. Owens stated that Claimant had to use crutches in May 2014 as well as a bone stimulator. (Tr. at 27, 425, 428)

However, since September 24, 2014, the ALJ found Claimant's lower left extremity impairment no longer met this Listing criteria

> because the record, consistent with the findings below, does not demonstrate gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s) . . . [w]ith: involvement of one major peripheral weight-bearing joint . . . resulting in inability to ambulate effectively . . . .

(Tr. at 28) In further support of his determination, the ALJ noted that "[b]eginning September 24, 2014, the claimant does not meet Listing 1.06, as x-rays showed complete healing of his left leg fractures." (Tr. at 28, 422) The ALJ further noted Claimant's testimony that he continued to have pain in his left leg that went from his ankle to his knee, and that he estimated he could stand for about 20 minutes at a time and walk for about 20 to 30 minutes at a time. (Tr. at 30) Additionally,

---

[7] Claimant has asserted that Dr. Owens did not opine he was disabled during the closed period, however, it is well known that disability determinations remain within the exclusive province of the Commissioner, notwithstanding any medical source opinions on such issues, further, any such opinions on administrative decisions would not be entitled to any special significance. See 20 C.F.R. §§ 404.1527(d)(2) and (3), 416.927(d)(2) and (3).

the ALJ considered Claimant's testimony that he could take care of his own personal hygiene, fix simple meals and perform light house[hold] chores. (Id.)

Next, the ALJ recognized Dr. Owens' testimony that the medical record confirmed that by September 2014 Claimant's left leg fractures healed, though Claimant continued to have pain, stiffness and sensory deficits. (Tr. at 30, 422, 449) It was noted that Dr. Owens found that the EMG study of the left lower extremity "showed traumatic superficial peroneal and saphenous neuropathy[,] [h]owever, x-rays to assess the status of the union bone in February 2016 did not show any new pathology that would indicate worsening of the left lower extremity." (Tr. at 30, 496-497) The ALJ also noted that on physical examination, Claimant had limited range of motion of his left ankle and left knee as well as loss of sensation in his left leg below the knee; Dr. Owens "stated that [Claimant] walked with a mild limp and used a cane." (Tr. at 30, 454-472[8], 490[9])

The ALJ then proceeded to discuss other medical records concerning Claimant's lower left extremity impairment, noting that Dr. Paudyal treated Claimant's neuropathic pain from his leg with medication, including a topical solution. (Tr. at 30, 561[10])

From this evidence, the ALJ determined that Claimant's left leg impairment, while severe enough to have met Listing 1.02A from August 20, 2013 through September 23, 2014, but by September 24, 2014, per Dr. Owens' testimony, the leg fractures had healed, and the subsequent medical records indicated that this impairment did not indicate a "worsening" of this condition, despite Claimant's continued "pain, stiffness, and some sensory deficits" (Tr. at 31, 422, 449, 496-497) and that Claimant "walked with only a mild limp." (Tr. at 31, 454-472, 490)

---

[8] This record concerns the treatment notes from Dr. Paudyal dated October 30, 2014 through October 19, 2015.
[9] This record concerns a treatment note from Dr. Billips dated December 7, 2015.
[10] This treatment note is dated December 9, 2015.

Continuing with his discussion of the lower left extremity impairment, the ALJ noted the opinion evidence, which consisted of Dr. Owens' testimony that Claimant could lift 50 pounds occasionally and 20 pounds frequently; that he could only carry 20 pounds occasionally and 10 pounds frequently; that he could sit for about 6 hours in an 8-hour day, stand for about 4 hours in an 8-hour day, and walk for about 2 hours in an 8-hour day; that he could occasionally climb stairs and ramps, never climb ladders, ropes, or scaffolds, and could not balance; that he could occasionally bend, stoop, crouch, and crawl; that he could operate foot controls less than occasionally on the left; that he should avoid unprotected heights, moving mechanical parts; and that he could tolerate heat and cold occasionally. (Tr. at 31-32) The ALJ gave this opinion "great weight", noting Dr. Owens' medical expertise and his "excellent summarization of the physical evidence contained in the record", although the ALJ recognized that medical records from Marshall Orthopaedics, Prudich Medical Center, Bluefield Clinic Company, and Dr. Billips, supported a finding that Claimant is more limited, and restricted him to light exertional level of activity with additional postural and environment limitations. (Tr. at 32, 422-446, 448-453, 454-472, 479-499)

With regard to Claimant's carpal tunnel syndrome, there is no finding that this particular impairment met any of the Listings from August 20, 2013 through September 23, 2014. However, the ALJ noted from Claimant's testimony that this impairment caused him to have numbness in his hands, and that he had trouble gripping things like jars. (Tr. at 30) The ALJ acknowledged Dr. Owens' testimony that the medical records indicated "findings of some left hand numbness, which is consistent with a finding of carpal tunnel syndrome." (Tr. at 30, 470[11]) The ALJ noted records

---

[11] This record concerned an office visit to Dr. Paudyal on October 19, 2015.

from Dr. Paudyal with the Bluefield Clinic Company contained nerve conduction studies confirming "the presence of mild left median neuropathy at the wrist (carpal tunnel syndrome)" and that Dr. Paudyal treated this condition by giving Claimant a left wrist brace to wear at night for six weeks, which subsequent records indicated that the brace "was helping the claimant's left hand partially." (Tr. at 30, 31 573[12]) The ALJ further noted that there was no indication of any surgery on Claimant's left wrist. (Tr. at 31)

As for the opinion evidence concerning Claimant's carpal tunnel syndrome, Dr. Owens testified that the medical records confirmed this impairment, rendered his opinion as to Claimant's lifting and carrying restrictions, but gave no opinion as to any manipulative limitations resulting from this impairment, *supra*.

Dr. Owens explicitly testified that Claimant's impairments did not meet any Listings. It is important to recall the following definitions pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 1.00B2b:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) ***that limits the functioning of both upper extremities***.

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's

---

[12] This treatment note is dated June 20, 2016.

home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

(*emphasis* added). In addition to recognizing that Claimant's fractures completely healed as of September 24, 2014, the medical records of evidence showed that Claimant no longer required the use of a walker or crutches, but had graduated to the use of a single cane. In other words, Claimant no longer had to rely on hand-held assistive devices that limited the functioning of *both* of his upper extremities, therefore, under the definition provided in Section 1.00B2b(1), Claimant was able to effectively ambulate as of September 24, 2014, thus, his impairment no longer met Listing criteria. Clearly, the testimonies provided by Dr. Owens as well as by Claimant himself, along with the medical evidence of record, all demonstrate that Claimant's left lower extremity achieved medical improvement to the point where he no longer met Listing criteria.

Further, the ALJ's recitation of the evidence of record demonstrates that Claimant's impairments had "decreased in medical severity" as the documented symptoms, signs and laboratory findings have shown these impairments have improved since the onset date. 20 C.F.R. §§ 404.1594(f)(3), 416.994(b)(5)(ii). In short, substantial evidence supports the ALJ's finding that Claimant's impairments had shown medical improvement; to the extent that Claimant contends that this finding was the product of a "non-medical opinion" lacks merit. (ECF No. 15 at 8)

As for medical improvement that is related to ability to work, Dr. Owens gave his opinion as to Claimant's residual functional capacity to do basic work activities. (Tr. at 46-47) As noted *supra*, the ALJ further modified Claimant's RFC to include additional postural and environmental limitations because such further restrictions were supported by the medical evidence of record. (Tr. at 32) In short, substantial evidence supported the ALJ's finding that Claimant's medical improvement is related to his ability to work under Sections 404.1594(f)(4), 416.994(b)(5)(iii), as

the record unequivocally shows that Dr. Owens gave an opinion on Claimant's RFC. Clearly, Claimant's capacity for work related activities had increased since his onset date, which is corroborated not only by the medical record, but also by Dr. Owens' testimony. To the extent that Claimant argues the ALJ concluded Claimant had medically improved as it related to his ability to work was rendered without a medical opinion, this argument lacks merit.

Accordingly, the undersigned **FINDS** that the ALJ's determination that Claimant had medical improvement based on the finding that his impairments no longer met or equaled Listings, and further **FINDS** that the ALJ's determination that Claimant's medical improvement related to Claimant's ability to work, based on the finding that he is capable of performing basic work activities complies with the pertinent Regulations are supported by substantial evidence.

<u>The RFC Assessment and Final Steps of the Sequential Evaluation Processes:</u>

Claimant raises several concerns with the ALJ's RFC assessment: limitations from his carpal tunnel syndrome were not considered (ECF No. 15 at 5-7); limitations stemming from Claimant's use of a cane with his dominant hand, when the record showed his left hand was impacted by carpal tunnel syndrome; these limitations were not properly addressed in the hypotheticals to the vocational expert where the Regulations envision bilateral capabilities in lifting and carrying (<u>Id</u>.); and there was no consideration of the "intense" physical therapy program that was recommended to Claimant following resolution of his left leg fractures. (<u>Id</u>. at 8)

An RFC determination is based "on all the relevant evidence in [the] case record", which includes "relevant medical and other evidence" as well as "statements about what [the claimant] can still do", "descriptions and observations of [the claimant's] limitations . . . provided by [the claimant] . . . [.]" <u>See</u> 20 C.F.R. §§ 404.1545(a)(1), (a)(3), 416.945(a)(1), (a)(3). A medical opinion

is not necessary in formulating a claimant's RFC, however, the Regulations and controlling case law are clear that the Commissioner is obligated to consider "all" the evidence in the record. Colvard v. Chater, 59 F.3d 165 (4th Cir. 1995) ("The determination of a claimant's [RFC] lies with the ALJ, not a physician, and is based upon all relevant evidence.")

As an initial matter, with regard to the "intense" physical therapy regimen to strengthen Claimant's left lower extremity, there is no evidence in the record that Claimant embarked on such a program, therefore the ALJ had no such evidence to consider in his determinations. The ALJ "is entitled to rely not only on what the record says, but also on what it does not say." See Edwards v. Colvin, 2015 WL 9216792, at *5 (M.D.N.C. Dec. 16, 2015) (quoting Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983). In this case, as discussed *supra*, the ALJ had adequate information to make a decision concerning Claimant's left lower extremity impairment.[13]

With respect to Claimant's carpal tunnel syndrome, there is no dispute that the record shows that Claimant's left hand demonstrated greater impairment than his right, as he was only prescribed a left wrist brace. The record further demonstrates that Claimant suffered from mild carpal tunnel syndrome in his right hand as well (Tr. at 573), and he testified that he experienced numbness and weakness in his "hands" (Tr. at 56, 57, 69, 70), which suggests bilateral carpal tunnel syndrome. As noted by Claimant, the ALJ does not specifically find Claimant's carpal tunnel syndrome was limited to the left hand or was bilateral. Nevertheless, the ALJ's recitation of the evidence of record shows that although Claimant alleged continued problems with his hands,

---

[13] At the close of the administrative hearing, Claimant's counsel represented to the ALJ that although there had been no "significant change in the Claimant's condition", there may be "a final note or two" of additional records (Tr. at 80), thus prompting the ALJ to hold the record open an additional thirty days, however, no additional records, nor requests for additional time or assistance, were received by the ALJ. (Tr. at 22) The Court Transcript also does not indicate that any additional records were submitted to the Appeals Council.

medical records from his treating physician, Dr. Paudyal, indicated that the left wrist brace had provided "partial improvement of his symptoms." (Tr. at 572) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986).

There is no evidence that Claimant received additional treatment for his left-sided carpal tunnel syndrome since he was prescribed a wrist brace in December 2015, and other than confirming a mild case of carpal tunnel syndrome in his right wrist in January 2016, there is no evidence of further treatment; the lack of further treatment for either hand/wrist does not support Claimant's statements of continued symptomatology related to his carpal tunnel syndrome. As observed by the ALJ, despite Claimant's subjective complaints with respect to his left hand, there is no indication of any surgery for it. (Tr. at 31) In short, Claimant's carpal tunnel syndrome, though a severe impairment, did not demonstrate a related functional loss to equate to a disability finding.

With regard to Claimant's use of a cane to assist with ambulation, Social Security Ruling ("SSR") 96-9p providing further guidance when the issue of hand-held assistive devices arises:

> Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand. For example, an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee), or to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers.

See, *Titles II and XVI: Determining Capability to do Other Work--Implications of a Residual*

*Functional Capacity For Less Than a Full Range of Sedentary Work*, SSR 96-9p, 1996 WL 374185, at *7. As demonstrated *infra*, Claimant's cane use, which was included in the ALJ's hypothetical to the vocational expert, did not pose any significant erosion of the unskilled sedentary work base.

As with the left lower extremity impairment, Dr. Owens had an opportunity to review the medical records concerning Claimant's carpal tunnel syndrome, and specifically acknowledged the record supported a finding that his left hand impairment was consistent with the diagnosis. Dr. Owens also gave an opinion that did not include specific functional restrictions as they related to Claimant's carpal tunnel syndrome, only that Claimant's capability of using "hand controls would be unlimited." (Tr. at 47) Notably, the medical record did not indicate any functional deficits related to Claimant's carpal tunnel syndrome; there is no statement in the medical records from Claimant's treating physicians that discusses any functional limitations from this impairment. An ALJ may rely on the testimony of a non-examining physician when it is consistent with the record. See Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Moreover, although Dr. Owens opined Claimant could lift and carry greater weight, the ALJ explicitly referred to the medical evidence that prompted his finding Claimant was more limited, and adjusted his RFC accordingly. (Tr. at 32) Nevertheless, the ALJ could reasonably rely upon Dr. Owens' testimony in crafting the controlling RFC hypothetical to the vocational expert.

Sections 404.1566(e) and 416.966(e) provide that the ALJ can satisfy the final steps in the sequential evaluation processes by relying on vocational expert testimony. It is well known that in order for a vocational expert's opinion to be relevant or helpful, it must be based on all other evidence in the record and responsive to a proper hypothetical question that fairly sets out all of a

claimant's impairments. <u>Walker v. Bowen</u>, 889 F.2d 47, 50 (4th Cir. 1989) (internal citations omitted). It is also well known that a hypothetical question is "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." <u>Fisher v. Barnhart</u>, 181 Fed. App'x 359, 364 (4th Cir. 2006) (citing <u>Johnson v. Barnhart</u>, 434 F.3d 650, 659 (4th Cir. 2005). Here, the ALJ fairly accounted for Claimant's credibly-established limitations based on the evidence of record in the hypothetical posed to the vocational expert.

With regard to Claimant's contention that the jobs identified by the vocational expert require "constant, repetitive use of one's hands" that are beyond his capabilities (ECF No. 15 at 6-7), it is noted that Social Security Ruling 00-4p provides that "[t]he DOT lists the maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings." 2000 WL 1898704, at *3. Further, "[a]lthough there may be a reason for classifying an occupation's skill level differently than in the DOT, the regulatory definitions of skill levels are controlling." <u>Id</u>. See also, <u>Warf v. Shalala</u>, 844 F.Supp. 285, 289 (W.D. Va. 1994) (" 'definitional requirements' for the jobs listed in the DOT are merely advisory in nature and serve only as a reference for the ALJ and VE.").

The vocational expert identified three sedentary jobs befitting Claimant's RFC, age, educational level and work history: the first job identified was an "addresser" (D.O.T. #209.587-010), which is defined as a clerical occupation and provides the following pertinent description:

> STRENGTH: Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

Finger Dexterity: Level 4 - Lowest 1/3 Excluding Bottom 10%

Handling: Frequently - Exists from 1/3 to 2/3 of the time
Fingering: Frequently - Exists from 1/3 to 2/3 of the time

The second job identified was "order clerk" (D.O.T. #209.567-014), designated as an occupation in the hotel and restaurant industry, which also provides the same handling and fingering requirements as those listed in the "addresser" position, *supra*. The third job, "inspector" (D.O.T. #669.687-014), also called "dowel inspector" and designated as an occupation in the woodworking industry, which consists of inspecting dowel pins for flaws, such as square ends, knots, or splits, and discarding defective dowels. In addition to requiring a strength level as described for the first two jobs, the pertinent handling and fingering requirements for the "inspector" position include: "Finger Dexterity: Level 3 - Middle 1/3 of the Population"; "Manual Dexterity: Level 3 - Middle 1/3 of the Population"; "Handling: Frequently - Exists from 1/3 to 2/3 of the time"; and "Fingering: Occasionally - Exists up to 1/3 of the time."

In short, none of these jobs require "constant, repetitive use of one's hands", but more importantly and significantly, there was no credible evidence in the record that Claimant would be unable to perform these jobs at substantial gainful activity levels. Because the objective medical evidence of record did not indicate Claimant's carpal tunnel syndrome or his use of a cane, or his left lower extremity impairment had demonstrably greater limitations than those supported by the medical records and opinion evidence, the ALJ only had to provide a hypothetical question to the vocational expert that included those credibly-established limitations as supported by the record. Walker, 889 F.2d at 50. The ALJ found that "[b]ased on the testimony of the vocational expert . . . beginning September 24, 2014, the claimant has been capable of making a successful adjustment to work that exists in significant numbers in the national economy." (Tr. at 33)

A reviewing court cannot be "left to guess about how the ALJ arrived at his conclusions." Mascio v. Colvin, 780 F.3d 632, 637 (4th Cir. 2015). The ALJ's decision must "include a narrative discussion describing how the evidence supports each conclusion," Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Mascio, 780 F.3d at 636)), and the ALJ "must build an accurate and logical bridge from the evidence to his conclusion." Id. (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). Indeed, "there is no particular language or format that an ALJ must use in his . . . analysis as long as there is sufficient development of the record and explanation of the findings to permit meaningful review." Clark v. Comm'r of Soc. Sec., No. 09–417, 2010 WL 2730622, at *17 (E.D. Va. June 3, 2010) (quoting Jones v. Barnhart, 364 F.3d 501, 505 (3rd Cir. 2004)). The ALJ's opinion is sufficient if it "not only sets forth the facts used in rendering his decision, but it also provides a thorough examination of the medical evidence." Id. In this case, the ALJ presented the facts that supported his conclusions with respect to Claimant's capabilities that permits meaningful review.

Accordingly, the undersigned **FINDS** the ALJ's RFC assessment and final analyses that Claimant could adjust to other work in reliance on the vocational expert's testimony are appropriate under the pertinent legal standards and supported by substantial evidence.

Further, in accordance with this Court's duty to scrutinize the record as a whole, the undersigned **FINDS** the Commissioner's conclusion that Claimant was no longer disabled beginning September 24, 2014 was "rational" and supported by substantial evidence. Oppenheim v. Finch, 495 F.2d at 397.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for judgment on the pleadings (ECF No. 15), **GRANT** the Commissioner's request to affirm the final decision (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of

such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: January 28, 2019.

Omar J. Aboulhosn
United States Magistrate Judge